Good morning. May it please the court. Scott Quinlan for Mr. Dhaliwal, who's the appellant. I would like to reserve, if I may, five minutes for a rebuttal. Okay. Watch the clock, and I'll also try to remind you as well. I'm sorry? I said if you can watch your clock there. It's our position that when there is direct evidence that co-conspirators' legal fees are paid as part of the criminal conspiracy, followed by, in this case, admission into evidence of Mr. Dhaliwal's trial counsel's fee payments by the leader of the conspiracy, then in that circumstance we submit that that creates an actual, ostensibly unwaivable conflict. In this case, Mr. Dhaliwal was advised of some of his conflict issues on January 5th during a Quintero hearing, but he was never advised that his counsel, Mr. Fowler, whose fees were being paid by the leader of the conspiracy, Mr. Mann, he was never advised that counsel could not be a witness for him and also be his trial attorney. What could counsel say? I mean, if the justification offered up and openly discussed at that hearing is that your client's position was that it made perfect sense for the other guy to pay because the other guy had gotten him into this mess in the first place, how could the attorney testify to that? Well, the attorney could testify to the circumstances. He's the precipient witness as to how he came to be paid. Mr. Dhaliwal. That's not a dispute. His testimony would be I'm paid by the other guy. Well, his testimony would also be that Mr. Mann's sister told him that she and her family were providing funds for attorneys because they felt a responsibility because whatever happened had happened. That doesn't sound like hearsay to you? I mean, what – how does that – how is that either probative of anything in this case or admissible evidence? That – it's not the only thing. I mean, he would have also testified that it was his position and he assured his client, Mr. Dhaliwal, that he would not be influenced by Mr. Mann. He assured the court that, that Mr. Dhaliwal concurred in that, that contrary to the situation with Adam Gage who was told to keep quiet and your attorney's fees will be paid if you get caught, Mr. Dhaliwal had always desired to – That's what Mr. Dhaliwal can testify to, but I don't hear anything that requires the attorney's testimony. Well, Mr. Fowler was a precipient witness to the two debriefings of Mr. – excuse me, Mr. Fowler was a precipient witness to the two debriefings by Mr. Dhaliwal where he was not offered a Queen for a Day letter or anything. And he would have made a powerful corroborating witness to Mr. Dhaliwal. As to what? To what? As to his efforts to cooperate as opposed to keeping quiet, which was what Adam Gage testified to. As to his agreement that he would not be influenced by any payment of his attorney's fees by Mr. – How is Mr. Fowler a witness to – I mean, he's a witness. He sat there and watched Mr. Dhaliwal take the position that he took. But I don't know how he can testify to it. Well – I mean, there's no doubt that Dhaliwal took the position. I want to cooperate, but I don't know anything because I'm innocent. Is that in dispute? No, that's true. So what could Fowler testify to that would advance the ball at all? He could have testified to the circumstances under which he was retained. And he could have also – But that wasn't in dispute either. I mean, Dhaliwal's position is that, yeah, Mon's paying because Mon got me into this mess. That was Mr. Fowler's trial tactic, that he was going to have – That's what was openly discussed at this hearing in advance of trial with the district court. That never worked. Well, they may not have offered up that defense, and that might be an IAC argument you developed at some point. But at this point, I don't see what the problem is, what it is that Fowler had to testify to. Okay. We brought up IAC because I was substituted in as subsequent counsel. And under the – that – and also, Mr. Fowler had preserved all issues that we could raise. So we were – we had no limitations on the issues that we could raise in the new trial motion. And we put on a hearing at which Mr. Fowler testified to what he did, what his thinking was, and what his reasons were, what his tactic was, if you would. And I pointed out to the trial court that in this circumstance, I could raise IAC because I was subsequent counsel and everything was in the record, so he could rule on it. There's no secret tactic. And the court, in fact, ruled on that when he denied my motion. But does that extend as – I mean, and there are certain subjects that the record was well-developed. I'm not sure that extends to the issue as to why your client wasn't asked to speak to certain issues. I mean, the problem apparently is that the excuse is – or the story is that he got me into this, he should pay for it, and that piece, which should have come from your client, didn't come out. That's true. Well, is the record developed as to that piece? Yes, because Mr. Fowler said that he did it. He testified that that was my tactic and that's what I did at trial. I had Mr. Dalywald testify to that. And we know from the record that that's not true. He never went near that subject. He didn't ask any questions whatsoever about the fee payments or how Mr. Dalywald came to be paid or anything like that. But doesn't that then go to a potential IAC claim rather than a conflict claim? I raised IAC. Well, I understand that. But there's separate kind of issues that we're looking at here. So you had started off on the conflict. Okay. There's no waiver. So I guess we're kind of moving. I recognize we've kind of moved you into IAC. Let me move back for just a minute. All right. Had Mr. Fowler followed through on that tactic, then we could argue, the government could argue that he was not deficient. But he didn't follow through on his stated trial tactic. And that's the IAC. Because if he had followed through and asked Mr. Dalywald questions, he would have become an unsworn witness to the circumstances under which Mr. Dalywald accepted. Do we have Mr. Fowler's testimony in this record? Yes, we do. And he has a full affidavit. We have his actual ‑‑ I put him on the stand. I subpoenaed him. We have his testimony. And he testified that he had Mr. Dalywald testify at trial to what you just said. But that didn't occur. That never happened. And that was the trial court made the finding that that had occurred, and I pointed out that that was clearly erroneous because Mr. Fowler didn't do that. And I've brought up all of Mr. Dalywald's testimony at trial, and it's not in there. So what we have here is that Mr. Fowler identified his trial tactic that he was going to use to rebut this evidence. He never did it. Had he done it, he would have been an unsworn witness to those events by questioning his client on stuff that he had personal knowledge of. I mean, you know, that would put every ‑‑ under that theory, every single criminal case takes that risk because of the financial arrangement between counsel and client. And that would be a problematic rule, it seems to me, to go down that path. I agree it is problematic. I've never had a case where the government put on a witness, Mr. Gage, who testifies that I was told by Mr. Mann that if I get pulled over and get caught hauling cocaine, to just keep quiet and he'll provide me an attorney, immediately followed by the admission into evidence of Mr. Fowler's fee payments, he was going to be charged with being an unwitten witness.   He was going to have had his fee payments, his wire transfers which had been previously marked as exhibits. Well, was there ‑‑ let me stop you there. Was there evidence to support that first proposition? I mean, there was evidence that Mann paid for the attorney's fees, but was there evidence that Mann paid for the attorney's fees in exchange for an agreement by your client to stay quiet? All there was ‑‑ you're talking about Adam Gage? Well, I'm talking about your client because I don't ‑‑ Fowler couldn't speak to Adam Gage. I still can't figure out what Fowler would speak to that was contested. Well, Fowler could have corroborated Mr. Dhaliwal. I think that ‑‑ As to what? As to all of the circumstances that Mr. Dhaliwal, that he would not be influenced, that Mr. Fowler told Mr. Dhaliwal that he would not be influenced by Mr. Mann's paying him, that he owed his loyalty to him, that Mr. Dhaliwal agreed, that he wanted to cooperate with the government despite the fee payments to him by Mr. Mann, and Mr. Fowler could have corroborated all of that. I don't ‑‑ frankly, I just don't see anything there that Fowler can testify to. There's no dispute that Mann paid, or Mann's sister, paid the money. We all can properly infer it came from Mann. Right. And everything after that is Dhaliwal's own insistence. Dhaliwal says, I want to cooperate, but I can't because I don't know anything. Fowler can't help that at all. All he can say is, my client told me that. Well, not that part, but he actually went in and cooperated, and Fowler was present when he debriefed, when Mr. Dhaliwal debriefed, to the government. And called the cops, called the government agent. If that's the contested issue, I don't think that's the contested issue. But that would also be true in numerous other cases where an attorney is present when somebody is being interviewed by the government. It creates a problem, and I think that the attorney should bring in an investigator, a defense investigator. But the attorney can't testify, my client told all, because the attorney doesn't know if the client told all. Well, he wouldn't say, my client told all. He would say that my client came in and debriefed and told. He did tell things about Mr. Bond. I mean, I could see a situation where a client says, I told this. Then you bring in the agent, the agent said no. Then you might have, you know, kind of serendipitously created a situation where the attorney would have to testify, but not before you call the agent. Well, I don't think. You have three minutes. I just wanted you to know that you have three minutes. Right. I'd like to reserve my remaining time. All right. Thank you. Good morning, Your Honors. I'm Karen Escobar, and I handled the trial in this manner. Mr. Quinlan was not trial counsel. Obviously, it was Mr. Fowler. I would like to address the conflict issue, but what is more concerning, at least to me, is the allegation of prosecutorial misconduct. So I'd like to be able to go there as well. The conflict of interest, if there was one, never became actual. The defendant has, did waive his right. The defense has not presented any authority that he cannot waive a conflict posed by a third-party fee arrangement. There is no authority that states that it's unwaivable. The record was thoroughly developed with respect to the third-party fee payment issue. There was not just one hearing, but there were two hearings after the government moved for reconsideration of the district court's finding that the defendant had waived his right to contest the conflict issue. And I agree with the court, whether Mr. Fowler was the attorney or not, it wouldn't have changed the evidence. So I'd also like to clarify, with respect to the proffer, Mr. Quinlan indicated there was never a queen for a day letter. That is not true. There was a proffer agreement, which indicated the information that was derived from those proffer meetings would not be used against the defendant at trial unless he testified and provided the government could use information provided in the proffer sessions to impeach him. There was a proffer agreement. It was an exhibit that was actually used at trial. When the government attempted to impeach the defendant with information, the government pulled out the proffer agreement to show that the government that was part of the agreement, which is a very typical agreement to be able to impeach with prior and consistent statements. Queen for a day letter? That's what Mr. Quinlan called it. I know. That's a term I – queen for a day, I remember. I'm not old. But queen for a day letter is not a term I've heard before. What's that? It's informal. I suspected as much. And it usually is just a letter that basically indicates we will not use anything against you to come in and talk. It's a one-day immunity. Yes. Basically. That's it. And Mr. Quinlan also indicated to the Court today that there was no evidence at trial with respect to the actual payment, the circumstances under which the payment to Mr. Fowler was made. That is not true. The defendant's attorney, defendant's wife, testified at trial on direct by Mr. Fowler with respect to the fee arrangement. She did testify. It was discussed at the government's brief at page 29. She indicated that Mr. Mann's sister-in-law and Mr. Graywall met and discussed the fee arrangement and indicated that Mr. Mann would pay because he got the defendant into this mess. It's also at excerpts of record 115 to 116. Mrs. Dollywall testified in the post-trial hearings that Mr. Quinlan held, and she indicated, yes, that's what she said at trial. I'd like to turn, if the Court would permit, to the alleged prosecutorial misconduct. Well, frankly, speaking for myself, I'm not much concerned about that. I'm more concerned about the issue that we were talking about before, the conflict issue, and particularly the part that moves over to the potential ineffective assistance claim. And I confess I was aware of the potential IAC argument, but hadn't looked at it as much before, so I'm feeling my way through here a little bit. First, what's your position with regard to whether the record is adequately developed for us to take up IAC as to any segment of the trial? Well, of course, generally it's not appropriate on direct appeal. But with respect to this limited issue of the fee payment and the waiver, I think the record is adequately developed with respect to the waiver issue. Okay. Now, the issue we developed before, and you seemed to speak to a moment ago, had to do with whether Mr. Fowler sufficiently put out the story or offered to the jury the counter explanation by his client that, well, sure, I'll let him pay for my lawyer, not because I'm part of the conspiracy, but because he got me into this and he should be responsible for getting me out. Now, I take it it's your position that that defense was offered up? Yes, and the district court acknowledged that as well, referring to it as an innocent lamb defense. Mrs. Dollywall, although she had no information regarding the transaction on the 20th of June in 2008, she was at work, but she indicated that the fee payment arrangement was just fine with her because Mr. Mann got her husband into this mess and he had nothing to do with it, nothing to do with drug trafficking whatsoever, which does relate somewhat to the prosecutorial misconduct claim relating to the association with this Amrik Athwal. She opened the door with respect to that. She said, my husband had nothing to do with cocaine trafficking, drug trafficking, anything, and that prompted the government to ask the question, well, isn't it true that during the time frame of the conspiracy he worked for Amrik Athwal, who owned London Transport, who she said he did work for in summer of 2003, in any event. And here, there were lots of transcripts. I mean, there are transcripts of the pretrial hearing, the trial, and then the post-trial hearing, and I want to make sure I'm clear on who said what at what time, and right now I'm focused on the evidence presented to the jury that ultimately convicted defendant. Was there evidence presented to the jury to support the proposition that Mann was paying because Mann got him into this? Did the defendant's wife testify to the jury as to that proposition? Yes, she testified to the fee arrangement. She testified that she was not there on the day of the deal. She really had no information regarding the transaction. That was clearly brought out on cross-examination. But Mr. Dollywall testified, and he asserted it. Did he say that to the jury? He had nothing to do with it. He didn't know what the money, this over $700,000 in cash in the rental car was for. He said he was going to make a payment of some sort, and this is where it gets into his ability, eligibility for safety valve. He gave varying stories on that. But at trial, he said that Mr. Mann called him on the day of the deal. Could you just let us know where you're reading? This was in my brief. If I might have the Court's indulgence. I'm just reading from my notes right now that there were three stories. He said his only involvement was on the day of the deal with Mr. Mann. And I'll find that. It's short shrift was given to safety valve, but it was toward the end. At 62 of the brief, supplemental excerpts of record 374 to 76, excerpts of record 467. At trial, and his testimony is included in the excerpts or the supplemental excerpts. Mr. Mann said he first became involved on the very day of the deal. He thought he was going to give money for a tire business involving Jazdev Singh, the co-defendant who pled out before trial. That was the first time he ever was involved in first discussion of moving any money. He didn't indicate that men from L.A. would bring the money. He was cross-examined by the government with respect to prior inconsistent statements he gave during the proffer session. There were at least two before trial. His first story was that he told, actually it conflicted with information he gave at the time of his arrest. He was cross-examined at trial with respect to that. On June 24, he told the DEA agents that he had met a man named Julio at a park who asked him to take money to the Denny's. The government then indicated that agents had seen him go to Mann's residence on the day of the deal, June 20. So that could not be correct. He then admitted that he had lied about Julio and said that one week before his arrest, Mann had called him and asked him to move some money for him, in contrast to what he testified to at trial that he just got involved in the deal on the day of the deal. That second story was at supplemental excerpts 374 to 375 and 376. At all times, whether you believe story one, two, or three, he indicated he did not know what the money was for. He did not know that the money was for a drug deal. At trial, he thought it was for a tire business involving the co-defendant.  In contrast to the recorded statements during the negotiations on the day of the deal, when Mann was waiting at the Denny's restaurant for the money to come, and he's talking on the phone to Dollywall at the time and saying, bring it here like you did before with Carlos, indicating that he, in fact, had prior involvement in the conspiracy before June 20. So the innocent lamb defense was clearly presented at trial. Mr. Fowler, whether or not he was counsel, would not have been able to provide any different information. And, in fact, the district judge suggested it would have looked even worse had Mr. Fowler been disqualified and called as a percipient witness at trial. So the district court did not abuse its discretion in accepting the waiver of any conflict. There was no actual conflict because Mr. Mann always maintained that he knew nothing of the drug trafficking. Was Mr. Dollywall asked specifically or did he testify to the payment of his defense expense, the payment to Fowler by Mann? Did he ask for that? Well, it came out tangled. Did the defendant testify as to the particular subject of Mann paying the attorney's fees? I don't believe that he got into the details about the sister-in-law and Mr. Graywall, Gershwang Graywall, who testified in the post-trial proceedings. I don't think he got into those details. It was Mrs. Dollywall who testified. So she's the only one that spoke to the attorney fee question in particular? To the details, it's … And I'm really focused here upon the narrow question or the effort to use the payment by Mann of the attorney's fees to link Dollywall into the conspiracy. As to that particular piece, it sounds like the defendant himself didn't testify, but Mrs. Dollywall did. Is that correct? You know, I'd have to go back to the record. I think he testified at trial, but I may be getting it confused with one of the in-camera. There were two in-camera hearings before trial on that issue. I think he testified at trial that it was fine with him because he was innocent. But I know that he did not get into the mechanics of it, the sister-in-law and Mr. Graywall paying for it. I know that he insisted at all times on his right to counsel, which … and the record was fully developed. And the government did bring it to the court's attention as soon as it received the information with respect to the wire transfers and the payment of Mr. Fowler's attorney fees. There was resistance to any attempt to disqualify. And the district court fully developed the record and indicated to Mr. Dollywall the risks of proceeding with Mr. Fowler, not just the fact that he could be a witness because he was a percipient witness. In fact, there was no information that Mr. Fowler had that was exculpatory and helpful to Mr. Dollywall. But the district court also specifically advised Mr. Dollywall about the fact that this evidence was relevant to conspiracy, the payment of third-party fees by the leader of the organization. The district court specifically advised Mr. Dollywall of that. And knowing that, he waived his right to other counsel. The district court also offered to have another expert, another lawyer, consult with him on precisely the conflict issue, not just to get a new attorney, but to consult with independent legal counsel on any conflict. And he waived that, said that he was fully confident that Mr. Fowler was representing his interests. Mr. Fowler indicated on many occasions and at the post-trial proceedings that Mr. Quinlan had that his allegiance was to Dollywall only, and therefore there was no conflict. If the Court pleases, I'll turn briefly to the objection. There was objection to evidence that serves as a basis of Mr. Quinlan's prosecutorial misconduct claim that relates to Amrik Athwal. And as I was indicating, the government did on cross ask about Amrik Athwal, who was ultimately convicted of cocaine trafficking out of the Central District of L.A. He actually was a resident of Bakersfield and a trucking business owner that Mr. Dollywall worked for. That evidence was elicited in response to testimony by both Mrs. Dollywall at trial and Mr. Dollywall that he had never been involved with anything, referring to drug traffickings or things like that. That's at Supplemental Excerpt of Record 345, and that prompted the government's question about Amrik Athwal and did you know that Mr. Athwal had been convicted of cocaine trafficking during the time frame. Mr. Dollywall's answer was no, therefore there was no prejudice, but it's our position that there was no error. The district court did not abuse its discretion in allowing the government to ask about that. It was very distinguishable from Nobare, which two of Your Honors heard. And the case is somewhat different. However, this Court found that questioning about an association with other drug traffickers did not warrant reversal. Here, clearly, the questioning was invited. Thank you, Your Honors. Thank you. If I may, I'd like to devote my remaining time to the IAC questions. This issue regarding Amrik Athwal and London Trucking, Mr. Athwal was not shown to be a defendant. He was not a co-conspirator, not shown to be he was not a witness. So he was none of these things. And they did not present any evidence that Amrik Athwal had ever been convicted of drug trafficking. They filed no Rule 404B that would indicate that Amrik Athwal was some prior conduct that my client was going to be attributed to. So on cross-examination, they asked, the counsel asked these questions that assumed facts, not an evidence, that they had no chance of getting an evidence, because they had not given us any 404B notice, that were irrelevant to this case. She asked about, did you know that Amrik Athwal was wiretapped? Did you know that Amrik Athwal had been convicted of cocaine trafficking? And then she even asked, did you know that he had been convicted? And these questions were objected to rightly by Mr. Fowler on relevance grounds. Initially ‑‑ Was there an admonition by the court about disregarding the attorney's statements? Ultimately. Ultimately. But what happened was, was that at first, the court allowed the questioning, rephrased it for counsel, and then directed Mr. Dollywell to answer it. But the whole line of questioning was irrelevant. And because there was no evidence of any wrongdoing by Amrik Athwal in the case, and because there was also no evidence ‑‑        I'm sorry. I'm sorry. I apologize. I apologize. I am not on this particular point. Okay. Well, I'm a little confused because you told me you were going to devote your time to IAC, and then launched into the Athwal. So I'm trying to figure out whether this goes to ‑‑ I'm sorry. ‑‑a prosecutorial misconduct or an evidentiary error by the district court or an effective assistance of counsel. Which of those three are ‑‑ You're right. You can choose any of them. I wandered off track. I apologize. Back on the IAC, Mr. Fowler didn't object to Adam Gage's testimony. I cited the case of U.S. v. Gee that Adam Gage's testimony related to events in 2005, nearly 32 months before Mr. Dhaliwal ‑‑ Did you ask Mr. Fowler about why he didn't object to Mr. Gage? I didn't ask him that question. Okay. So we don't have in the record then whether Fowler thought there was a strategic reason for not questioning Gage, whether he thought this might just blow it up, call too much attention to it, or whether he should just let it go, or whether he just botched this. Adam Gage's testimony ‑‑ This goes to Judge ‑‑ I'm going to interrupt you, but this goes to Judge Clifton's prior question to you as to whether the record is sufficiently developed for us to deal with the IAC. So you didn't ask him that question, but you still think that the record is sufficiently developed? The reason I think that is because this issue was addressed outside the presence of the jury. And I cited you a case, I'm going to mispronounce it, motions for the proposition that there was no reason, absolutely no reason, for counsel not to raise the matter out of the presence of the jury. He may have a tactical reason, you know, not to raise it in front of a jury, but if the matter is being addressed outside the presence of the jury, there's no reason. And what was being addressed outside the presence of the jury at that time was his wire transfer fees coming in. I have to back up a little bit. Adam Gage's testimony came in in front of the jury without the objection of Mr. Fowler. I misspoke there. But then they addressed the effect of admitting Mr. Fowler's fee payments outside the presence of the jury. And at that time, he should have pointed out that Adam Gage's statements could not be used for the prohibited purpose, which was to show Mr. Dollywall's later participation in a conspiracy. They could be used to show a conspiracy, but not the – remember, that's 3215. But what we don't know is why. I'm sorry? He may have had a misguided, but he might have had some theory about why he didn't either want an admonition or even his gage being discussed. We just don't know because we don't have a record on that. So we're left to make a determination on ineffective assistance of counsel without the counsel's participation in telling us, you know, why he went that route. Okay. I mean, so that's one of the difficulties, of course, we always get into is we wonder, well, what if, what if. Now, if it's unhabeas and they don't have a sufficient record developed, then, of course, it's denied because of the various deference. But here, you're basically making the argument that probably should have been made, you know, below, of course. But we don't really have a record from Mr. Allen. I submit, really, there's no excuse for not raising this outside the presence of the jury. Mr. Fowler was asked, well, when the Adam Gage testimony came in, and he might have been asked also, you know, when your statements came in, did you consider moving for a mistrial? He was asked that by the judge. And he said, no, the thought never occurred to me because, as a trial attorney, I've never seen mistrial granted during the course of a trial. So that part is developed, that the judge asked him, well, why didn't you move for a mistrial when this stuff came in? And he explained his reasoning was that he'd never seen it happen. And that's what he did. Has a motion been granted? Pardon me? Would a motion for mistrial have been granted? Well, you know, I'd like to say yes, but. I haven't seen any mistrials granted either, so it's. He was probably right on that, but, I mean, there have been some. And then you'd get into the question of prejudice. Well, we've given you an extra four minutes here. I appreciate it. So I'm going to say now that the argument in the United States versus Dolly Wallace concluded. The case is submitted. Thank both counsel for your arguments this morning.
judges: McKeown, Clifton, Bybee